IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW OWEN PENTZ,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR *FRANKS* HEARING AND MOTION TO SUPPRESS<br><br><br><br>Case No. 1:12-CR-89 TS |

This matter is before the Court on Defendant's Motion for a *Franks* Hearing and Defendant's Motion to Suppress. The Court held an evidentiary hearing on Defendant's Motion to Suppress on March 14, 2013. Both Motions are now fully briefed. For the reasons discussed below, the Court will deny Defendant's Motions.

I. STATEMENT OF FACTS

On October 17, 2012, a dispatcher at the Morgan County Sheriff's Office received a call from Gordon Willey. Mr. Willey informed the dispatcher that Defendant had assaulted him, chased his four-year-old son, and stolen his truck. Mr. Willey related that Defendant was armed

with a large knife and that he might have a sawed-off shotgun in his motor home. It was later reported that the complainants heard what they thought might have been a gunshot.[1]

Three officers—Deputy Peay, Detective Hammack, and Deputy Grose—were dispatched to the Spring Hollow Campground, where the alleged assault had occurred. The officers made contact with Mr. Willey, his girlfriend, and their son. The officers spoke with the individuals who informed them that Defendant and Mr. Willey had been drinking alcohol and working on a vehicle. At one point, Defendant became upset, took out a large knife, and stabbed a car battery a few times before throwing it to the ground. Defendant then grabbed Mr. Willey by the neck and began chocking him. Mr. Willey was able to break free, but Defendant began chasing Mr. Willey's four-year old son with a knife. Defendant stopped chasing the boy and again grabbed Mr. Willey around the neck, raising the knife in a threatening manner. After Mr. Willey was able to break free, Defendant got into Mr. Willey's truck and drove away, further up Spring Hollow Canyon.

The officers retrieved their rifles and began to make their way up the canyon in search of Defendant. The officers witnessed Defendant attempt to drive his motor home away from them. The officers continued walking up the canyon road where they observed Mr. Willey's truck. The truck contained a number of puncture marks that appeared to have been made by a large knife.

---

[1]The transcript of the 911 call does not appear to contain a statement from Mr. Willey about a gunshot. *See* Docket No. 44, Attachment A. However, the dispatch log introduced at the evidentiary hearing states: "COMP THINKS THAT HE HEARD WHAT SOUNDED LIKE A GUNSHOT." Evid. Hearing Ex. 2. Further, both Deputy Peay and Detective Hammack testified that they were informed by dispatch that the complainants had heard a gunshot. Docket No. 32, at 9:19-91, 60:9-10. Thus, while the source is unclear, it is clear that the responding officers were informed that the complainants stated that they heard what may have been a gunshot.

Continuing along the road, the officers saw Defendant stumbling toward them. Defendant appeared to be intoxicated and was having a difficult time walking. The officers ordered Defendant to the ground, but Defendant did not obey their commands. Rather, Defendant became argumentative and told the officers to shoot him. It was not until Deputy Peay un-holstered his taser that Defendant finally complied with the officers' requests. Defendant was then taken into custody and transported to jail.

Detective Hammack continued up the road to attempt to locate the motor home that the officers had seen Defendant driving. The motor home was found further up the road, stuck and high centered in the middle of the road. The driver's side door of the motor home was open. When Detective Hammack looked through the open door he could see a large knife. Detective Hammack then proceeded to walk around the exterior of the vehicle, looking through the windows to see if anyone else was in the motor home or to see any other possible evidence in plain view. At no point did Detective Hammack enter the vehicle because he did not want to "contaminate the scene or jeopardize . . . [the] case."[2] No other officer entered the motor home prior to the search warrant being obtained.

It was while he was looking through the windows that Detective Hammack saw "a shotgun laying on the floor in plain view."[3] Detective Hammack proceeded to take pictures through the windows with his phone.

---

[2] Docket No. 32, at 68:10-11.

[3] *Id*. at 69:2-3.

Describing the location and detail of the shotgun, Detective Hammack testified:

> The firearm was laying on its barrel. The stock portion was laying up in the air towards me. I could see that it was a bolt action shotgun. The magazine was out of it. It appeared that there was some type of rope or cording tied around the barrel to the stock, if I remember correctly. It appeared that the barrel had been shortened and the stock portion had been removed, just allowing the pistol grip of the shotgun.[4]

Detective Hammack then informed the other deputies of what he had observed. Deputy Peay contacted Deputy Taylor to start the process of obtaining a search warrant. When Deputy Taylor arrived on the scene, he went to the location of the motor home. There, he was able to verify what Detective Hammack had seen. As with Detective Hammack, Deputy Taylor was able to look into the windows of the motor home and saw a shotgun inside.

Deputy Taylor proceeded to prepare an Affidavit for Search Warrant.[5] In relevant part, the Affidavit stated:

> On October 17, 2012, Andy PENTZ and another individual were hanging out with each other at a campground deep in the hills of Morgan, on the east end of 2600 W Spring Hollow Rd. The GPS coordinates are N41.1 0915 W111. 71229. The two men got in an altercation, and both men had been drinking alcohol. During the course of the altercation, PENTZ strangled the other man by the throat. PENTZ also had a large knife. He held it in his hand and at one point raised it at the victim in a threatening manner while putting his hand on the mans [sic] throat. The victim broke free and was able to call police.
> The victim told dispatch there was a firearm in the RV that was at the scene (The RV has plate B611BD and is VIN 1GBKP37WXE3320503). PENTZ allegedly threatened the victim with the firearm, and at one point the victim thought he heard a gunshot when PENTZ took off in the RV. When deputies arrived, they had the information there was a gun on scene and in possession by PENTZ.

---

[4]*Id*. at 71:6-13.

[5]Docket No. 44, Attachment H.

PENTZ took the RV and went up in the hills, a few hundred feet east of the campsite. PENTZ went up the hill and got struck [sic] on a hill (high centered) in the RV. He got out and walked back to camp. When he walked back, Deputies were on scene. With the information they had of an aggravated assault and an intoxicated man in possession of a firearm, Deputies ordered PENTZ down at gunpoint, who ignored their commands. Once a deputy drew his Taser, PENTZ complied with deputies [sic] commands and was taken safely into custody.

When deputies went to look at the RV with plate B611BD, they saw in plain view a firearm. I also witnessed this firearm, and is [sic] appears to be a shotgun with the barrel sawed off, and the stock also sawed off in a pistol grip fashion. This is concerning to us, because I personally know PENTZ is a convicted felon. He was recently released from prison. He is a known drug user in our community. He is known to be violent, violent towards officers and violent to members of the public whom he does not like.

The firearm is in plain view through two windows in the RV.

We have seized the RV and are going to tow it back to our office to conduct the search.[6]

Around this same time, the officers had asked dispatch to send a towing company to the scene so that the motor home could be extricated, as it was blocking the road. The towing company was able to dislodge the motor home from its location. Since the motor home would not fit on the tow truck and was operable, one of the individuals from the towing company drove the motor home to the sheriff's office. When the person from the towing company entered the motor home, he saw a large knife on the center console. He picked up the knife and moved it to the floor so that it would not fall onto him.

After the motor home was driven to the sheriff's office, the officers received notice that their application for a search warrant had been approved. Deputy Peay and Depute Grose proceeded to search the motor home.

---

[6]*Id*.

Deputy Peay testified that he began the search by opening a door towards the middle of the motor home. He stated that, upon opening the door, "[a] shotgun fell towards me . . . with the barrel pointed right at me."[7] Deputy Peay described the shotgun as having a barrel that had been sawed off as well as a stock that had been sawed off. A spent shell was inside. Deputy Grose testified that the shotgun was located on the floor of the motor home "just inside the side door."[8]

After the search of the motor home was completed, the motor home was taken to an impound yard. While impounded, Defendant has entered the motor home on at least two occasions to remove certain items.

## II. DISCUSSION

A.     MOTION FOR *FRANKS HEARING*

In *Franks v. Delaware*, the Supreme Court held that a defendant may, in certain circumstances, "challenge the truthfulness of factual statements made in an affidavit supporting [a search warrant]."[9] However, a defendant is entitled to an evidentiary hearing under *Franks* only upon making "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."[10]

---

[7] Docket No. 32, at 30:20-23.

[8] *Id*. at 85:23-24.

[9] *Franks v. Delaware*, 438 U.S. 154, 155 (1978).

[10] *Id*. at 155-56.

Upon such a showing, a defendant must then establish by a preponderance of the evidence at the *Franks* hearing that the false information is indeed the product of the affiant's perjury or reckless disregard for the truth and that without it the affidavit is insufficient to establish probable cause.[11] If the defendant meets this burden, the search warrant "must be voided and the fruits of the search excluded."[12]

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."[13] After all, the warrant affidavit enjoys a "presumption of validity."[14] Accordingly, the defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false" and offer a "statement of supporting reasons."[15] These allegations should be supported by "an offer of proof" in the form of "[a]ffidavits or sworn or otherwise reliable statements of witnesses" or an explanation as to their absence.[16] Then, even upon a showing of perjury or reckless disregard, if the false statements or omissions of which the defendant complains would not alter the probable cause determination, the defendant is not entitled to a *Franks* hearing.[17] "An affidavit establishes

---

[11]*Id*. at 156.

[12]*Id*.

[13]*Id*. at 171.

[14]*Id*.

[15]*Id*.

[16]*Id*.

[17]*Id*.

probable cause for a search warrant if the totality of the information it contains establishes the 'fair probability that contraband or evidence of a crime will be found in a particular place.'"[18]

The Court finds that Defendant has not met his burden and is not entitled to a *Franks* hearing. As an initial matter, Defendant does not point to specific portions of the affidavit that he claims to be false. However, Defendant does take issue with certain statements in the affidavit, which the Court will discuss.

First, Defendant argues that "Deputy Taylor uses the word 'allegedly' when mentioning the threat to Mr. Willey in the Affidavit. However, when discussing the gun, he is emphatic in writing that the gun *IS* in the motor home and that Pentz *IS* in possession of a firearm."[19]

To begin with, this language does not appear in the affidavit, at least not as stated. Further, by the time the search warrant application was completed, both Detective Hammack and Deputy Taylor had viewed the shotgun in the motor home. Thus, it is perfectly logical that Deputy Taylor would write that the gun was in the motor home and that Defendant, as the owner and driver of the motor home, was in possession of that gun.

Second, Defendant states that Deputy Peay and Detective Hammack wrote in their police reports that Mr. Willey mentioned hearing a gunshot, while Deputy Grose did not mention this fact. Further, Deputy Peay testified that he was informed of the possible gunshot through dispatch, but the 911 call does not reflect this.

---

[18]*United States v. Soderstrand*, 412 F.3d 1146, 1152 (10th Cir. 2005) (quoting *United States v. Rice*, 358 F.3d 1268, 1274 (10th Cir. 2004)).

[19]Docket No. 44, at 12-13.

The search warrant affidavit states that "at one point the victim thought he heard a gunshot when PENTZ took off in the RV."[20] Defendant has provided the Court with the transcript of the 911 call. Defendant is correct that there does not appear to be any reference to a gunshot in that transcript. However, a review of the dispatch log, which Defendant introduced at the evidentiary hearing, reveals that dispatch informed the officers that Mr. Willey heard what he thought was a gunshot. Deputy Peay and Detective Hammack testified that they were so informed. Thus, while the source of this information is unclear, the information provided to the officers was that Mr. Willey thought he heard a gunshot. As a result, the Court cannot find the statement in the search warrant affidavit to be false. Further, this statement, even if false, would not alter the probable cause determination. Therefore, Defendant is not entitled to a *Franks* hearing on this point.

Third, Defendant takes issue with the statement that "deputies" saw the firearm in plain view. This, Defendant argues, is "not true."[21] Defendant's argument essentially boils down to his belief that only Deputy Hammack could have seen the firearm and that Deputy Taylor would have been too short to have peered into the windows of the motor home. However, Deputy Taylor testified that he was able to look into the window of the motor home and was able to verify the presence of a shotgun. The Court finds Deputy Taylor's testimony credible. Defendant offers nothing more than mere speculation to rebut this testimony. This is insufficient to warrant a *Franks* hearing. Further, even if Deputy Taylor did not see the firearm, it is

---

[20]Docket No. 44, Attachment H.

[21]Docket No. 44, at 13.

undisputed that Detective Hammack did. Thus, probable cause for the search warrant would remain.

Fourth, Defendant argues that "Deputy Taylor described the gun with a striking amount of detail that seems unlikely to have been determinable from outside the motor home."[22] Defendant appears to take issue with the statement in the affidavit that the firearm "appears to be a shotgun with the barrel sawed off, and the stock also sawed off in a pistol grip fashion."[23] This language is consistent with the testimony provided by Detective Hammack at the evidentiary hearing. Detective Hammack testified that "[i]t appeared that the barrel had been shortened and the stock portion had been removed, just allowing the pistol grip of the shotgun."[24] There is no evidence to suggest the statement in the affidavit was false. Further, Defendant has not shown that, without the description of the gun, the probable cause determination would have been different.

Finally, Defendant takes issue with allegedly contradictory statements about the positioning of the gun that Deputy Peay and Deputy Grose made at the evidentiary hearing on the Motion to Suppress. There is nothing in the search warrant affidavit about the position of the firearm and any such statement would not alter the probable cause determination. Further, these statements were made as result of the search, which occurred after the warrant was received. Therefore, Defendant is not entitled to a *Franks* hearing on this, or any other, issue.

---

[22]*Id.*

[23]Docket No. 44, Attachment H.

[24]Docket No. 32, at 71:6-13.

10

B.　　MOTION TO SUPPRESS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[25] "The touchstone of the Fourth Amendment is reasonableness. Generally, reasonableness requires law enforcement officers to undertake a search pursuant to a warrant supported by probable cause."[26]

Defendant argues that the evidence of the gun should be suppressed because "photographs and inconsistent testimony indicate that the gun was not in plain view and that deputies had to enter the motor home to obtain evidence of the gun."[27] Defendant makes a number of arguments to support this position, many of which have been discussed above in relation to Defendant's request for a *Franks* hearing. However, all of these arguments can be addressed rather easily.

The testimony at the evidentiary hearing was that Detective Hammack looked through the windows of the motor home and saw a shotgun in plain view. Deputy Taylor was able to verify this information and a search warrant was obtained. Everyone who testified on the issue stated that, until the warrant was received, no officer entered the motor home. The Court finds the testimony of the officers to be credible and there is no evidence to the contrary. While Defendant

---

[25] U.S. Const. amend. IV.

[26] *United States v. Carter*, 511 F.3d 1264, 1267 (10th Cir. 2008).

[27] Docket No. 41, at 13.

11

argues that the officers must have entered the motor home prior to obtaining the warrant, this is nothing more than speculation and conjecture.

Based on the testimony at the evidentiary hearing, and considering all of the evidence in the record, the Court finds the search of the motor home was performed after the officers obtained a valid warrant. Therefore, there is no basis to suppress the firearm and Defendant's Motion to Suppress must be denied.

### III. CONCLUSION

It is therefore

ORDERED that Defendant's Motion for *Franks* Hearing (Docket No. 42) and Motion to Suppress (Docket No. 18) are denied. It is further

ORDERED that the time from the filing of the Motion to Suppress—January 7, 2013—through the date of this Order is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(D) and (H).

The Court will set this matter for a status conference to establish a new trial date.

DATED   May 21, 2013.

BY THE COURT:

_____
TED STEWART
United States District Judge